# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STEPHEN PITELL, on behalf of himself and all others similarly situated,

Appellant,

v.

KING COUNTY PUBLIC HOSPITAL DISTRICT NO. 2, d/b/a EVERGREENHEALTH; and DOES 1 through 25, inclusive,

Respondent.

No. 76720-8-I

DIVISION ONE

PUBLISHED OPINION

FILED: August 13, 2018

DWYER, J. — Stephen Pitell sought emergency medical care at EvergreenHealth. He signed a consent to care form in which he agreed to pay the balance due on his account. But instead of paying, he filed a lawsuit against EvergreenHealth, claiming that the consent to care agreement lacked a definite price term and was therefore unenforceable. As have courts across the country, we hold that the contract price term is supplied by EvergreenHealth's standard list of charges (its "chargemaster"). Because the price term is definite, the consent to care agreement is enforceable. Accordingly, we affirm.

I

Stephen Pitell was admitted to EvergreenHealth with abdominal pain on January 2, 2015. At the time, he was uninsured and did not qualify for Medicare

or Medicaid. Upon his arrival at the hospital, Pitell signed a consent to care form that stated, in pertinent part:

> I agree, whether I sign as representative or as patient, that in consideration of the services to be rendered to the patient, I agree to be personally responsible for the balance due after any applicable insurance payment(s).

The consent form went on to state, "You are responsible for payment of your account" and "At my request, staff will provide me with an estimate of the billed charges for services I am likely to receive." Pitell did not request an estimate of charges.

Following his treatment and discharge, EvergreenHealth billed Pitell $32,324. Given that he had over $50,000 in his bank account, Pitell's request for charity care status was denied. The hospital did, however, reduce the charge by 20 percent because Pitell was uninsured, which lowered the amount due to $25,859.20. For the same services, four of the five largest commercial insurers would pay more: $27,632, $28,157, $28,228, or $33,138.

EvergreenHealth billed Pitell based on the hospital's list of charges, which is generally referred to as a "chargemaster." Pitell did not pay the balance due on his account. Instead, he filed suit against EvergreenHealth on behalf of a class of similarly situated individuals. In his suit, he requested a declaratory judgment that the consent form is unenforceable. He also alleged causes of action for negligent and intentional concealment. EvergreenHealth counterclaimed to seek collection of the unpaid bill as well as for the expenses of defending a frivolous action. The trial court granted EvergreenHealth's motion

2

for summary judgment, dismissing the case and ordering Pitell to pay the amount of the discounted bill plus costs and fees.[1] Pitell appeals.

II

A

We review summary judgment de novo. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). We engage in the same inquiry as the trial court and consider the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Hertog, 138 Wn.2d at 275.

The purpose of contract interpretation is to ascertain the intent of the parties. Roats v. Blakely Island Maint. Comm'n, Inc., 169 Wn. App. 263, 274, 279 P.3d 943 (2012). Washington courts "follow the objective manifestation theory of contracts." Hearst Commc'ns, Inc., 154 Wn.2d at 503. When interpreting an agreement, we focus on its objective manifestations to determine the parties' intent. Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227, review denied, 186 Wn.2d 1011, 380 P.3d 501 (2016). "We impute an intention corresponding to the reasonable meaning of the words used." Hearst

---

[1] Pitell claims that he was charged an unreasonable amount for the services received. However, in the trial court, he provided no evidence as to what amount would be reasonable. In addition, it is worth noting that, while he admits that he owes a reasonable amount, Pitell has never paid a dime for the services rendered—either to EvergreenHealth or into the registry of the court. At all times, he has had the ability to pay.

Commc'ns, Inc., 154 Wn.2d at 503 (citing Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, 123 Wn.2d 678, 684, 871 P.2d 146 (1994)).

B

Pitell argues that the consent to care agreement is not enforceable because the agreement's reference to a "balance due" is an open price term.[2] EvergreenHealth argues that because the chargemaster supplies the price term in the consent to care form, the contract is enforceable.

Like other hospitals around the country, EvergreenHealth maintains a chargemaster that it uses to bill patients for the particular services received. It includes over 16,000 line items that establish the standard charge for each service. Deductions from these rates are common, resulting from negotiations with insurers, set government rates, charity care, prompt pay discounts, or uninsured discounts.

> In the context of a contract for the provision of and payment for medical services, a hospital's chargemaster rates serve as the basis for its pricing. Each hospital sets its own chargemaster rates, thus each hospital's chargemaster is unique. It is from these chargemaster prices that insurance companies negotiate with hospitals for discounts for their policyholders. And other reimbursement schemes are based in part on hospital chargemaster rates. Even the 2010 Federal Patient Protection and Affordable Care Act recognized the centrality of chargemasters to hospital billing practices. See Timothy D. Martin, The Impact of

---

[2] Pitell was required by law to have health insurance at the time in question. He had the means to purchase such insurance. Instead, he made an economic decision to forego compliance with the law.

Pitell now argues that an equitable doctrine—quantum meruit—should govern the determination of the amount he owes. By making an economic decision to be uninsured, in violation of applicable law, Pitell clearly behaved inequitably. Whether equity can be invoked by one who behaved inequitably is an issue that appears at the forefront of this dispute. However, Pitell neither briefed nor even recognized this issue. Because we can decide this case on other grounds, we need not discuss this issue further.

> *Healthcare Reform on Revenue–Cycle Management and Claim Coding*, 4 J. Health & Life Sci. L. 159, 175 (2011) (recognizing that the Act requires hospitals to publish their chargemasters annually).

Allen v. Clarian Health Partners, Inc., 980 N.E.2d 306, 310 (Ind. 2012) (citations omitted). When billing a patient,

> "[i]t is only after each individual is charged according to the Chargemasters that this amount is decreased accordingly by any health coverage program benefits. . . . [T]he base price is the same for each individual pursuant to the Chargemasters. It is only the deductions from the base price that may vary from patient to patient."

Limberg v. Sanford Med. Ctr. Fargo, 881 N.W.2d 658, 662 (N.D. 2016) (second alteration in original).

Many courts have entertained, and almost uniformly rejected, challenges similar to those advanced here. These courts "recognize[] the uniqueness of the market for health care services delivered by hospitals." Allen, 980 N.E.2d at 311. They hold that a contract's reference to a hospital's "rates" or "charges" are sufficiently definite to refer to a chargemaster list for the price term.[3]

---

[3] In addition to the cases discussed in the text, the following cases have affirmed the enforceability of contracts where a chargemaster supplies the price term: Harrison v. Christus St. Patrick Hosp., 430 F.Supp.2d. 591, 595 (W.D. La. 2006) (concluding "regular rates and terms" did not create open-ended contract); Cox v. Athens Reg'l Med. Ctr., Inc., 631 S.E.2d 792, 796 (Ga. Ct. App. 2006) (finding "in accordance with the rates and terms of the hospital" is a definite price term); Morrell v. Wellstar Health Sys., Inc., 633 S.E.2d 68, 72 (Ga. Ct. App. 2006) ("[T]he agreement in the contracts to pay for 'all charges' unambiguously referred to the written summary of specific charges . . . which established the price terms on which the parties intended to bind themselves."); Satterfield v. S. Reg'l Health Sys., Inc., 634 S.E.2d 530, 531 (Ga. Ct. App. 2006); Holland v. Trinity Health Care Corp., 791 N.W.2d 724, 730 (Mich. Ct. App. 2010) (finding "usual and customary charges" unambiguously referred to the chargemaster).

For example, in DiCarlo v. St. Mary Hospital, 530 F.3d 255, 264 (3d Cir. 2008), the court concluded that the contract term, "all charges" referred to the chargemaster, and was therefore not an open price term.

> The price term "all charges" is certainly less precise than [the] price term of the ordinary contract for goods or services in that it does not specify an exact amount to be paid. It is, however, the only practical way in which the obligations of the patient to pay can be set forth, given the fact that nobody yet knows just what condition the patient has, and what treatments will be necessary to remedy what ails him or her. Besides handing the patient an inches-high stack of papers detailing the hospital's charges for each and every conceivable service, which he or she could not possibly read and understand before agreeing to treatment, the form contract employed by St. Mary's is the only way to communicate to a patient the nature of his or her financial obligations to the hospital. Furthermore, "it is incongruous to assert that [a hospital] breached the contract by fully performing its obligation to provide medical treatment to the plaintiff[ ] and then sending [him] [an] invoice[ ] for charges not covered by insurance."

DiCarlo, 530 F.3d at 264 (footnote omitted) (quoting Burton v. William Beaumont Hosp., 373 F.Supp.2d 707, 719 (E.D. Mich. 2005)).

Similarly, in Shelton v. Duke University Health System, Inc., 633 S.E.2d 113, 116 (N.C. Ct. App. 2006), the court held that the contract term "regular rates" did not leave the price term open. Rather, it was "'definite and certain *or capable of being made so*'" by reference to the chargemaster. Shelton, 633 S.E.2d at 116 (2006) (quoting Elliott v. Duke Univ., Inc., 311 S.E.2d 632, 636 (N.C. Ct. App. 1984)). The court reasoned that

> [i]t is common, almost expected, that a course of treatment embarked upon will, through unforeseen circumstances, be amended, altered, enhanced, or terminated altogether, and a completely new course of treatment begun. In light of this, it would be impossible for a hospital to fully and accurately estimate all of the treatments and costs for every patient before treatment has

6

begun. It would be cumbersome, and against patients' interests, to require hospitals to seek new authorization from a patient whenever some medical circumstance requires a new course of treatment. For this reason, it is entirely reasonable and predictable that patients would agree to pay the hospital's regular rates for whatever services might be necessary in treating their particular ailments or afflictions.

Shelton, 633 S.E.2d at 116.

In Allen v. Clarian Health Partners, Inc., hospital patients challenged their medical bills, arguing that the contract they signed had an indefinite price term. The contract in question stated, "'In consideration of services delivered by Clarian North Medical Center and/or the physicians, the undersigned guarantees payment of the account, and agrees to pay the same upon discharge.'" Allen, 980 N.E.2d at 309. In holding that "the account" impliedly referenced the chargemaster, the court reasoned,

A contract need not declare a specific . . . dollar amount for goods or services in order to be enforceable. See . . . Restatement (Second) Contracts § 4, illus. 1 ("A telephones to his grocer, 'Send me a ten-pound bag of flour.' The grocer sends it. A has thereby promised to pay the grocer's current price therefor."). In the context of contracts providing for health care services precision concerning price is close to impossible. . . . [O]mitting a specific dollar figure is "the only practical way in which the obligations of the patient to pay can be set forth, given the fact that nobody yet knows just what condition the patient has, and what treatments will be necessary to remedy what ails him or her."

Allen, 980 N.E.2d at 310 (quoting DiCarlo, 530 F.3d at 264).

In so holding, the court aligned itself with numerous similar opinions.

Patients contend their promise to pay "the account" for treatment is indefinite and therefore cannot constitute a price term for the hospital's services. We disagree. Many courts have addressed contracts similar to those of Patients' and most have held that price terms in these contracts, while imprecise, are not sufficiently

7

indefinite to justify imposition of a "reasonable" price standard. For example, the Third Circuit held that a patient's promise to pay "all charges and collection costs for services rendered" was not indefinite, and "can only refer to [the hospital's] uniform charges set forth in its Chargemaster." DiCarlo, 530 F.3d at 264. Other courts have reached similar conclusions. See, e.g., Banner Health v. Med. Sav. Ins. Co., 216 Ariz. 146, 163 P.3d 1096, 1101 (Ariz. Ct. App. 2007) (finding that patients who agreed to "pay the account" agreed to pay charges billed in accordance with the hospital's chargemaster that was filed with the state health department pursuant to statute); Holland v. Trinity Health Care Corp., 287 Mich. App. 524, 791 N.W.2d 724, 730 (2010) (concluding the phrase "usual and customary charges" in hospital's contract with a patient "unambiguously refers to the 'Charge Master'"); Shelton v. Duke Univ. Health Sys. Inc., 179 N.C. App. 120, 633 S.E.2d 113, 114, 116–17 (2006) (finding the language "regular rates and terms of the Hospital" not to be an open price term where the prices were set forth in the hospital's chargemaster), review denied; Nygaard v. Sioux Valley Hosp. & Health Sys., 731 N.W.2d 184, 188-89, 191 (S.D. 2007) (interpreting as definite a price term requiring patient to pay "unspecified and undiscounted charges for medical care" which were "pre-set by [the hospital] in its sole discretion").

Allen, 980 N.E.2d at 310-11.

While these cases examined somewhat different contract language than that in EvergreenHealth's contract, their reasoning is instructive. Pitell agreed to pay "the balance due" and was informed that he was "responsible for payment of [his] account." This reference to an "account" reflects that the parties understood that Pitell would be charged for the services received, and that the amount charged would be determined by an extant set list of prices. In addition, the contract notified Pitell that he could request an estimate of charges, which further acknowledged the existence of a list of prices from which an estimate could be constructed. The contract language demonstrates the parties' mutual understanding that the amount owed by Pitell was definite or capable of being

8

made so by reference to an extant list of charges—in this case, the chargemaster.

Pitell cites to a few cases in support of his argument that the contract's price term is indefinite and therefore unenforceable. None are persuasive. In Washington Chocolate Co. v. Canterbury Candy Makers, Inc., 18 Wn.2d 79, 138 P.2d 195 (1943), the sale price in a contract varied by buyer and was not tied to market rates. The court concluded that the price was left to the unrestricted and arbitrary determination of the seller, and was therefore indefinite. But here, EvergreenHealth does not have unlimited discretion to charge patients for services received. It does so based on the chargemaster, with departures from those rates set in advance by negotiation or regulation. Pitell also cites to Heaton v. Imus, 21 Wn. App. 914, 587 P.2d 602 (1978), reversed on other grounds, 93 Wn.2d 249, 608 P.2d 631 (1980), but that case merely states that the absence of a price term requires a quantum meruit analysis. These cases are not helpful.

Additionally, Pitell cites to Western Washington Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 102 Wn. App. 488, 7 P.3d 861 (2000), for the proposition that external provisions to an agreement must be incorporated by clear and unequivocal reference. But here, the parties did not attempt to incorporate a list of charges by reference. Rather, as set forth above, the contract's reference to an "account" refers to EvergreenHealth's uniform charges, as set forth in its chargemaster. It was not necessary to incorporate the chargemaster by further reference.

C

Were we to resort to extrinsic evidence, the result here would be the same. The available evidence plainly supports that the parties mutually assented to a price term supplied by the chargemaster.

We may consider extrinsic evidence to assist in ascertaining the intent of the parties in entering into a contract, regardless of whether the language used in the writings is deemed ambiguous. Hearst Commc'ns, Inc., 154 Wn.2d at 502 (citing Berg v. Hudesman, 115 Wn.2d 657, 672, 801 P.2d 222 (1990)).

> The court may consider (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

Spectrum Glass Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 129 Wn. App. 303, 311, 119 P.3d 854 (2005) (citing Berg, 115 Wn.2d at 666-68). However, we may not consider "(1) '[e]vidence of a party's unilateral or subjective intent as to the meaning of a contract word or term;' (2) '[e]vidence that would show an intention independent of the instrument; or' (3) '[e]vidence that would vary, contradict or modify the written word.'" Kelley v. Tonda, 198 Wn. App. 303, 312, 393 P.3d 824 (2017) (alterations in original) (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695, 974 P.2d 836 (1999)).

Pitell testified that he understood how hospitals bill patients. Before his treatment at EvergreenHealth, Pitell was generally aware that hospitals billed uninsured patients at different rates than insured patients. After reading an

article in Time magazine and seeing a documentary, Pitell understood that hospitals used a set list of prices to calculate charges to their patients. He understood that uninsured patients did not benefit from lower rates negotiated by insurers, given that they had no insurer. At deposition, Pitell testified:

> Q: . . . So when you went in there as an uninsured patient, you understood that it was likely that you were going to be charged by the hospital using a chargemaster for the services you were receiving, correct?
> A: Correct.

This testimony demonstrates the parties' mutual intent that, after accepting health care services, Pitell would be charged from an extant list of charges that provided the prices. Extrinsic evidence supports the enforceability of the consent to care agreement between Pitell and EvergreenHealth.

## III

Pitell argues that the trial court erred in dismissing his causes of action for "negligent and intentional concealment" because EvergreenHealth had a duty to disclose the nature of its rates. These are recognized concepts in construction law, but not in the circumstances of this case. We therefore affirm their dismissal.

Affirmed.

WE CONCUR: