# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MIDTOWN PROPERTIES L.L.C., a Washington limited liability company,<br><br>Respondent,<br><br>   v.<br><br>THE CITY OF BONNEY LAKE, a Washington municipal corporation,<br><br>Appellant. | No.  57333-4-II<br><br><br><br>UNPUBLISHED OPINION |

PRICE, J. — This case involves the interpretation of a "Development Agreement" that applies to a large parcel of property located in the city of Bonney Lake (City).  Midtown Properties LLC (Midtown) purchased the property with the intention of building 1,100 multifamily attached dwelling units.  The City objected to Midtown's planned development, taking the position that the Development Agreement limited development to about 600 residential units and required a mix of single- and multifamily units.  Midtown disagreed and filed a lawsuit, requesting, in part, declaratory judgment for the interpretation of the Development Agreement.

The parties filed cross-motions for summary judgment.  The superior court granted summary judgment in favor of Midtown, deciding that Midtown's planned development was consistent with the Development Agreement.  The superior court also decided that Midtown was entitled to rely on a related final environmental impact statement (FEIS).  The City appeals.

We reverse and hold Midtown's current development proposal violates the Development Agreement. The Development Agreement limits the number of units that can be built and requires building single-family units. We remand to the superior court for further proceedings consistent with this opinion and, if necessary, to consider the issue of Midtown's potential reliance on the FEIS.

## FACTS

### I. BACKGROUND

In 1941, Weyerhaeuser donated 149 acres of forest land in Bonney Lake to Washington State University (WSU). The property was used for research and operated as a "demonstration forest" for decades. Clerk's Papers (CP) at 106. In the mid-2000's, WSU discovered that many trees in the forest were sick and closed the demonstration forest. WSU, in concert with Weyerhaeuser (which had retained a reversionary interest), sought to sell the property to generate revenue for its research elsewhere.

In 2009, the property was zoned for public facilities, but WSU sought to rezone the property to make it easier to market.[1] As part these efforts, WSU presented a development plan for the city council to consider. WSU's plan sought to divide the demonstration forest into three parcels—approximately 35 acres for commercial development, 40 acres for a public park, and 60 acres for residential development. The City and WSU began negotiating a Development Agreement to execute the plans WSU had presented.

---

[1] WSU and Weyerhaeuser were both involved in the rezoning and negotiation of the Development Agreement, but we refer to the negotiating party as WSU for simplicity.

No. 57333-4-II

A. ENVIRONMENTAL IMPACT STATEMENTS

In preparation for the negotiations, the City prepared an environmental review required by the State Environmental Policy Act (SEPA), chapter 43.12C RCW. The City prepared a draft environmental impact statement (DEIS).

The DEIS was based on projected types and numbers of dwelling units and stated that the "Proposed Actions" (the plan of development) would include building 255 single-family detached units, 180 low-rise apartment units, and 155 condominium units (590 units total). The DEIS also stated it was prepared "[b]ased on an assumed 587[ ]residential units on the site under the proposed density range." CP at 153 n.1.

Following the SEPA review process, the City issued the FEIS. Although the FEIS did not repeat the numeric values for the projected residential units, the FEIS expressly incorporated the DEIS. The FEIS separately addressed an estimated density of dwelling units for the property in the description of the Proposed Actions:

> [A] range of residential densities achieving at least 10 units per acre averaged over the residential area including single-family detached homes with fee simple ownership, with or without garages and moderately high density (small and/or 'cottage homes', duplexes, townhomes, condominiums, apartments or a combination thereof)[.]

CP at 156.

B. NEGOTIATIONS AND DEVELOPMENT AGREEMENT

Over the course of several months, attorneys for the City and WSU negotiated the details of the Development Agreement. Also participating as an agent of WSU was Quadrant Homes, a property development company specializing in single-family residences. Quadrant Homes

3

planned to purchase the property and build between 500 and 600 housing units as a mix of single-family detached units and multifamily attached units.

An agreement was reached, and on December 22, 2009, the City finalized and adopted the Development Agreement. The Development Agreement is lengthy, but the following provisions are relevant to the parties' dispute over the number and character of residential units permitted by the Agreement.

1. Parks Impact Fees Waiver

The Development Agreement addressed the City's parks impact fees (PIF). Generally, the City imposes a one-time PIF for the development of residential housing units when a building permit is issued.[2] The PIFs raise money for public parks to serve the residents of new housing units.

As part of the negotiations, Quadrant Homes requested a waiver from paying the PIFs in exchange for the donation of 40 acres of the property to the City for a public park. Key to calibrating the size of the property donation in lieu of the PIF was the number of proposed residential units. Quadrant Homes estimated that the 40 acres for a public park would be approximately equivalent to the PIFs that would be typically owed for the size of its proposed development. Quadrant Homes explained that its estimation of 500 to 600 residential units made the proposal a reasonable trade.[3]

---

[2] Bonnie Lake Municipal Code (BLMC), https://www.codepublishing.com/WA/BonneyLake.

[3] Prior to approval, public hearings were held for the community to discuss the proposed plan. During one meeting, a city councilmember asked how the PIF waiver was calculated, and the attorney negotiating for WSU explained that because no more than 600 units were going to be developed, 40 acres of land was a fair exchange for the PIF waiver.

The City agreed to the PIF waiver. Accordingly, the Development Agreement contained the following provision that explained the PIF waiver by estimating the impact of the proposal for 672 units:

> 3.4.1 The City's Comprehensive Plan identifies a deficit in the level of service for community parks. To address this deficit, the Comprehensive Plan calls for 1-2 new community parks dispersed throughout the City, each with an acreage of 20 to 30 acres, or one large park of 40 to 50 acres in south or central Bonney Lake. *Dedication of the City Property for recreational purposes shall qualify WSU/WY for a credit against future parks impact fees*.
>
> 3.4.2 The Parks Element of the Comprehensive Plan values community park property at $50,000/acre. Using this number, the value of the Property dedicated to the City for recreational uses, including the YMCA Property but not including the perimeter trail or Triangle Park, is two million dollars ($2,000,000). The City's current parks impact is $2,974.00/residential unit. *Accordingly, the value of the dedicated property is equivalent to the impact fee for 672 residences, more than the projected number of dwelling units for the Project. The parties agree that dedication of the City Property fully satisfies the parks impact fees that would otherwise be payable by developers of the WSU Property and that no parks impact fees will be due*.

CP at 52 (emphasis added).

2. Density Requirements

The Development Agreement also included building density requirements because transitioning the property from a demonstration forest to housing required a rezone of the property. Thus, any property developer would be subject to zoning requirements that imposed units per acre density requirements. The Development Agreement imposed the density requirement, stating,

> The minimum density for residential uses will be 10 units per net acre averaged over the 61.7 acres. An individual residential project must have no fewer than 6 units per net acre. The applicant for each residential project must, prior to submitting an application for preliminary plat approval, conduct a pre-application conference with the City. The applicant must demonstrate to the City's satisfaction how its proposed project will allow the residential uses on the 61.7 acres to accomplish a minimum average density of 10 units per net acre.

CP at 49.

### 3. Tree Conservation Will Not Limit Full Development

The Development Agreement also addressed construction in relation to tree preservation, stating,

> Without infringing upon full *development of the residential area at the maximum density allowed in the zone*, the City may require developers of residential projects to retain non-exempt trees in accordance with the community character element of the Comprehensive Plan.

CP at 60 (emphasis added).

### 4. WSU Site Plan Included Single-Family Detached Units

The Development Agreement also had several provisions that addressed single-family residential units. For example, the Agreement included a description of WSU's plan for future construction, labeled the "General Project Elements." CP at 48. The General Project Elements explained that WSU's development plan included a variety of residential units, including single-family and multifamily units:

> The plan for the WSU Property is composed of the following elements . . .
>
> 1.2.3 <u>Residential</u>: 64.7 acres comprised of:
>
> 61.7 acres of single family detached, medium, and moderately high density residences.

CP at 48-49. The Development Agreement then described the "Permitted Residential Land Uses," which included a description of the single-family units that were part of WSU's site plans:

> Single Family Detached Dwelling units will consist of detached single family homes with fee simple ownership with or without garages. To authorize this use, the City will amend the current R-3 zoning Code to add an Overlay that allows single family detached dwellings as shown in Attachment 8.

CP at 49.

    5.  Incorporation of and Developer's Reliance on FEIS

The Development Agreement expressly referenced the FEIS and tied the necessity of further SEPA review to whether any future project is consistent to those analyzed in the 2009 process. The Development Agreement specified that if a future project fell within the Proposed Actions contemplated by the environmental impact statements, the developer could rely on the FEIS and generally avoid the need to conduct additional SEPA review.

    C.  ZONING OF THE RESIDENTIAL PROPERTY

Initially, the residential property was anticipated to be rezoned to Bonney Lake's R-3 designation, which only allowed high-density development of multifamily units. Quadrant Homes requested the City allow the construction of single-family units, so the City adopted an "overlay zone" that permitted the developer of the property to build single-family units within the R-3 zone. CP at 108. The zone overlay was only applicable to the property originating from the demonstration forest, and stated that "[a]ll uses shall be the same as those permitted in the R-3 zone, except that single[-]family detached residences shall also be permitted." CP at 249 (BLMC 18.19.020; BLMC 18.19.010).

The density of the R-3 zoning was similar to the densities imposed in the Development Agreement. Whereas the Development Agreement imposed a minimum density of 10 units per acre, the R-3 overlay zone used a density range:

> Density shall be a minimum of 10 and a maximum of 20 units per net acre for residential uses, exclusive of public rights-of-way.

CP at 249 (BLMC 18.19.030(B)). Given the size of the WSU property, this R-3 density maximum would, by itself, allow the construction of over 1,000 residential units.

D. MIDTOWN'S PURCHASE OF AND PLANS TO DEVELOP PROPERTY

WSU and Quadrant Homes never developed the property. Years after the adoption of the Development Agreement, Midtown purchased the property. City officials and representatives from Midtown met multiple times in 2020 and 2021 to discuss Midtown's plans for development. Consistent with the density range of the R-3 zoning overlay, Midtown wanted to build about 1,100 housing units, solely comprised of multifamily attached units, rather than a mix of single- and multifamily units.

The City informed Midtown that its plans were inconsistent with the Development Agreement.[4] The City believed that Midtown's plans greatly exceeded the limits on residential units and that Midtown was required to include single-family residences. The City explained that Midtown could either submit a new proposal that complied with the Development Agreement, propose an amendment to the Development Agreement, or wait until the Development Agreement expired in 2024.

II. MIDTOWN'S LAWSUIT AND PROCEDURAL HISTORY

Instead of pursuing any of the City's proposed options, Midtown filed a lawsuit against the City. Midtown requested declaratory judgment for the interpretation of the Development Agreement and relief under the Land Use Petition Act (LUPA), chapter 36.70C RCW. Midtown sought the determination that the Development Agreement did not require building a mix of single-

---

[4] The Development Agreement bound successors-in-interest to the agreement.

and multifamily units and did not limit the number of units Midtown could build on the property beyond the density restrictions of the R-3 overlay zoning.

The parties stipulated that the superior court's interpretation of the Development Agreement should precede litigating the LUPA claim. Accordingly, the superior court stayed the LUPA proceedings until the declaratory judgment was decided.

Both the City and Midtown moved for summary judgment. The City argued that the Development Agreement "requires the developer to construct single[-]family and multifamily units with a total unit count in the 600 range." CP at 379. Midtown argued that the Development Agreement did not separately limit the number of residential units beyond the R-3 zoning overlay and did not require a mix of residential units. Midtown also argued that it could rely on the FEIS without further SEPA review being conducted.

The superior court granted summary judgment in favor of Midtown. The trial court concluded:

> 1) The minimum and maximum densities for residential development under the Development Agreement are set forth in [the R-3 overlay zone] and incorporated into the Development Agreement;
>
> 2) Single[-]family residential use is allowed use under the R-3 High Density Overlay but the Agreement does not establish a requisite allocation between various residential uses or require a development proposal to include any particular number of sing[le] family residences; and
>
> 3) [Midtown] is entitled to rely on the FEIS for its development.

CP at 397, 406.

The City appeals.

9

ANALYSIS

On appeal, the City argues that the Development Agreement limits the number of units that can be built to approximately 600 and requires that both single- and multifamily units be built. The City also argues Midtown cannot rely on the FEIS for its planned development because the planned development is inconsistent with the Proposed Actions. Midtown argues that the maximum number of units is governed only by the R-3 overlay zone ordinance, which would actually allow more units than Midtown plans to build. Midtown also argues single-family units are permitted, but not required. Finally, Midtown argues that because its proposed development falls within the scope of the FEIS, it can rely on the FEIS without conducting additional SEPA analysis.

I. LEGAL PRINCIPLES

A. SUMMARY JUDGMENT STANDARD OF REVIEW

We review summary judgment orders de novo. *W.M. v. State*, 19 Wn. App. 2d 608, 621, 498 P.3d 48 (2021), *review denied*, 1 Wn.3d 1012 (2022). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). When the facts of a case are not in dispute, we may reverse summary judgment for the prevailing party below and enter summary judgment for the other party. *Impecoven v. Dep't of Revenue*, 120 Wn.2d 357, 365, 841 P.2d 752 (1992).

B. INTERPRETATION OF THE DEVELOPMENT AGREEMENT

Local government entities are authorized by statute to enter into development agreements with property owners. RCW 36.70B.170(1). The agreement "must set forth the development standards and other provisions that shall apply to and govern and vest the development, use, and

mitigation of the development of the real property for the duration specified in the agreement." *Id.* Cities are prohibited from approving land use permits that are inconsistent with a development agreement. RCW 36.70B.180.

Development agreements are contracts and are subject to the rules of contract interpretation. *City of Union Gap v. Printing Press Props., L.L.C.*, 2 Wn. App. 2d 201, 224, 409 P.3d 239, *review denied*, 191 Wn.2d 1003 (2018). "It is a fundamental precept of contract law that contracts must be interpreted in accordance with all of their terms." *Storti v. Univ. of Wash.*, 181 Wn.2d 28, 38, 330 P.3d 159 (2014). "The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). "[A] court's primary goal is to ascertain the parties' intent at the time they executed the contract." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). But a court does "not interpret what was intended to be written but what was written." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005).

We "may also 'consider extrinsic evidence to assist in ascertaining the intent of the parties in entering into a contract, regardless of whether the language used in the writings is deemed ambiguous.' " *Estate of Carter v. Carden*, 11 Wn. App. 2d 573, 582, 455 P.3d 197 (2019) (quoting *Pitell v. King County Pub. Hosp. Dist. No. 2*, 4 Wn. App. 2d 764, 774, 423 P.3d 900 (2018)). "The intent of the parties in reducing an agreement to writing may also be discovered from 'the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.' " *Id.* (internal quotation marks omitted) (quoting *Tanner Elec. Coop*, 128 Wn.2d at 674). But extrinsic evidence is only

used to help interpret the contents of the contract, not the intention of the parties independent of the contract. *Id.*

At summary judgment, contract interpretation may be determined as a matter of law "when the only dispute relates to the legal effect of language in a written contract." *George D. Poe & Co. v. Stadium Way Props.*, 7 Wn. App. 46, 49, 498 P.2d 324 (1972). Interpretation of a contract provision is a question of law when the interpretation does not rely on the use of extrinsic evidence or only one reasonable inference can be drawn from the extrinsic evidence. *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 85, 60 P.3d 1245 (2003).

II. DEVELOPMENT AGREEMENT LIMITS THE NUMBER OF UNITS THAT CAN BE BUILT

The City argues that the Development Agreement prohibits Midtown from constructing 1,100 units. The City primarily points to the Agreement's language regarding the dedication of land for a park in exchange for waiver of the payment of the PIFs. We agree with the City.

Here, the Development Agreement included provisions that addressed an expected number of units to be built, most notably in the section addressing the PIF waiver and land donation. The Development Agreement explained that the donation of land was determined by estimating the park fees for a specific number of residential units, 672 units. The section further explained that 672 was "more than the projected number of dwelling units for the Project." CP at 52. The full provision states:

> Dedication of the City Property for recreational purposes shall qualify WSU/WY for a credit against future parks impact fees.
>
> 3.4.2 The Parks Element of the Comprehensive Plan values community park property at $50,000/acre. Using this number, the value of the Property dedicated to the City for recreational uses, including the YMCA Property but not including the perimeter trail or Triangle Park, is two million dollars ($2,000,000). The City's

> current parks impact is $2,974.00/residential unit. *Accordingly, the value of the dedicated property is equivalent to the impact fee for **672 residences, more than the projected number of dwelling units** for the Project. The parties agree that dedication of the City Property **fully satisfies the parks impact fees** that would otherwise be payable by developers of the WSU Property and **that no parks impact fees will be due.***

CP at 52 (emphasis and boldface added).

The clear intent of the parties to limit the project to 500 to 600 units can be seen from several components of this language. First, the Development Agreement completely waived payment of PIFs in the future, such that "no [PIFs] will be due." CP at 52. Locking the City into the math of this waiver shows that the parties intended that the residential unit limitations were an important component of the Agreement.

Second, the language assigned a value of $2,000,000 to the dedicated property.[5] The parties generally agree that based on this assigned value of the dedication, PIFs were covered for 672 units. The clarity of this math is further indication that the parties intended to limit the number of residential units to the number included in section 3.4.2. Therefore, this language captures the intent of the parties that no more than 672 residences would be built.

Moreover, the DEIS supports this conclusion. In two different locations, the DEIS contemplated construction of less than 600 units. First, the DEIS explained that it was prepared under the assumption that 587 units would be built, and second, the analysis for traffic impacts was performed assuming that 590 units would be constructed. Considering the Development

---

[5] Midtown argues that the City and WSU undervalued the dedicated property and the true value would actually support payment of PIFs for units in excess of the Development Agreement's expressed value. Even if true, an incorrect valuation would not necessarily be relevant to the conclusion that the parties still intended to link the waiver of the PIFs to an expected number of residential units.

Agreement expressly referenced the EIS process, this language is further indication the parties intended the Development Agreement to limit the number of units separately from the density limits of the R-3 overlay zoning.[6] The only reasonable conclusion to be drawn is that, consistent with the intent of the parties, the Development Agreement limited the number of residential units to no more than 672, and certainly less than the units Midtown intends to build.

Midtown challenges this conclusion by pointing out that nothing overtly restricts development to about 600 units and that the Development Agreement's explicit imposition of R-3 overlay zone's density allowance shows the parties did not intend to cap the number of units that could be built. Midtown also argues that the Development Agreement's tree preservation provision's statement that " 'full development of the residential area at the maximum density allowed in the zone' " may be conducted is further proof that the R-3 overlay zone is the only unit limit in the Development Agreement. Br. of Resp't at 18 (boldface omitted) (quoting CP at 206). Based on Midtown's argument, the R-3 overlay zoning would support more than 1,200 units.

Midtown's position is unpersuasive. Although the R-3 overlay zoning allows properties to reach a maximum density of 20 units per acre, this general density allowance does not necessarily convey that the parties intended to allow building to that upper limit. In addition, Midtown's reference to the statement found in the Development Agreement that "full development of the . . . density allowed in the zone" is taken out of context. Although Midtown characterizes this statement as expressly permitting the developer to construct at the upper limits of the zone's

---

[6] And if extrinsic evidence from negotiations of the Development Agreement is considered, it leads to the same result. As noted above, at a public hearing on the Development Agreement, the attorney for WSU explained the PIF waiver was calculated as a fair exchange because no more than 600 units were to be developed.

density allowance, the statement is located in the portion of the Development Agreement related to tree preservation. The statement provides that the retention of trees would not limit the units that the developer could build, not that, overall, the developer could build the maximum number of units permitted under the R-3 overlay zoning densities.

Midtown also challenges the City's position by pointing out that, except for the adoption of R-3 zoning overlay, the Development Agreement contained no explicit residential unit limit and the City has been inconsistent in what the precise limit might be. Br. of Resp't at 62 ("[T]he City has thrown out density numbers ranging from 587; to 600; to 672; to 736; to 862.") (footnotes omitted).

But even if the Development Agreement did not include a conclusive number for the maximum units, if the intent of the parties is clear, we may supply a reasonable term for the maximum units. " 'When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court' " *Estate of Carter*, 11 Wn. App. 2d at 582-83 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 204 (AM. L. INST. 1981)). Given that the Development Agreement's PIF waiver language specifically valued the land dedication as the equivalent of PIFs for 672 units, we determine that number represents a reasonable maximum for residential units.

Ultimately, Midtown must comply both with the zoning requirements and the Development Agreement's limit that only up to 672 units could be built. We hold that Midtown's proposed development of 1,100 units is not consistent with the Development Agreement. Thus, we reverse the superior court and grant summary judgment for the City on this issue.

III. DEVELOPMENT AGREEMENT REQUIRES A MIX OF SINGLE- AND MULTIFAMILY UNITS

The City next argues that the Development Agreement does not support Midtown's plan to build only multifamily units. The City points to specific language from the Development Agreement that included references to single-family detached units. Midtown argues that the Development Agreement *allows,* but does not *require,* single-family detached units. We agree with the City.

First, the City points to the "General Project Elements" of the Development Agreement, which states,

> The plan for the WSU Property is composed of the following elements . . .
>
> . . . .
>
> 1.2.3  Residential . . .
>
> 61.7 acres of single family detached, medium, and moderately high density residences.

CP at 48-49 (§ 1.2).

Next, the City identifies the provision entitled "Permitted Residential Land Uses," which included a definition for single-family detached units:

> Single Family Detached Dwelling units will consist of detached single family homes with fee simple ownership with or without garages. To authorize this use, the City will amend the current R-3 zoning Code to add an Overlay that allows single family detached dwellings as shown in Attachment 8.

CP at 49 (§ 1.3.1).

The City's position is persuasive. These provisions require single-family units through the use of mandatory language. The "General Project's Elements" provision provided that plans for the property included different housing units, stating the plan for development "*is composed of*" different elements, including specified residential unit types. CP at 48 (emphasis added). In turn,

16

the residential development was 64.7 acres, "comprised of . . . 61.7 acres of *single[-]family* detached, medium, *and* moderately high density residences." CP at 49 (emphasis added). The Development Agreement then continues, explaining that the single-family units "*will consist* of detached" units on fee simple lots. CP at 49 (emphasis added). The intent to require single-family residences is further shown by the City's extension of the R-3 zone overlay for this property only, allowing the future developer to build single-family homes in a high-density zone when such units would otherwise not be permitted. The parties' intent is clearly expressed in the Development Agreement's language—single-family units are required to be built.[7]

Contrary to Midtown's argument that the language merely *allows* building of single-family units, the Development Agreement's language requires single-family units. We reverse the trial court's determination that the Development Agreement did not require building single-family units and grant summary judgment for the City.

IV. MIDTOWN'S RELIANCE ON FEIS

The City additionally argues the superior court erred in determining Midtown was entitled to rely on the FEIS without having to conduct additional SEPA review. The City argues this issue is premature when the full extent of the development has not yet been decided. We agree the issue is premature.

The parties agree that if Midtown's permit or application falls within the development contemplated by the environmental impact statements, Midtown may rely on the FEIS.

---

[7] Further, if considered, extrinsic evidence also supports the conclusion that the City anticipated that single-family houses would be built. Quadrant Homes, as a builder of single-family houses, wanted to build such units, and the parties drafted the Development Agreement intending that the developer would build at least some single-family homes.

The superior court determined that Midtown was entitled to rely on the FEIS but made this decision with an erroneous interpretation of the Development Agreement. Considering plans may change, the parties may revisit whether Midtown's development falls within those contemplated by the FEIS with the superior court on remand.[8]

CONCLUSION

We reverse and hold Midtown's current development proposal violates the Development Agreement. The Development Agreement limits the number of units that can be built to no more than 672 and requires building single-family units. We remand to the superior court for further proceedings consistent with this opinion and, if necessary, to consider the issue of Midtown's potential reliance on the FEIS.

---

[8] Midtown argues the City fails to preserve this issue for appeal because it "essentially ignored" the issue at the superior court. Br. of Resp't at 66; *See* RAP 2.5(a) (this court may refuse to review claims not raised below). The City responds that it sufficiently addressed the scope of the FEIS in its response to Midtown's motion for summary judgment. We exercise our discretion to address this issue. *See State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015).

No. 57333-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

LEE, P.J.

CHE, J.