# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ESTATE OF LOIS S. CARTER,

Respondent,

v.

BRYAN D. CARDEN and TERA M.
CARDEN, Husband and Wife and the
marital community comprised thereof,

Petitioners.

DIVISION ONE

No. 78465-0-I

PUBLISHED OPINION

FILED: December 30, 2019

DWYER, J. — This is a discretionary review of a summary judgment order dismissing a contract claim and a subsequent order authorizing the termination of water service to a family home. The Estate of Lois Carter (the Estate) owned two lots, Lot A and Lot B. The Estate sold Lot B, which contained a residence, to Bryan and Tera Carden, representing that the residence would be supplied with potable water from a well on Lot A. Subsequent to the sale, a dispute arose between the parties and the Estate sued the Cardens.

This discretionary review arises from the dismissal, on summary judgment, of the counterclaim brought by the Cardens asserting that the Estate failed to provide a shared well agreement as required by the purchase and sale agreement (2013 PSA) by which the Cardens purchased Lot B. The trial court granted partial summary judgment for the Estate, concluding that the Cardens, in bad faith, had prevented the Estate from performing its obligations under the 2013 PSA. The trial court ordered that the Estate was excused from providing a

shared well agreement. Subsequently, it authorized the Estate to terminate the Cardens' access to the water from the well on Lot A. On discretionary review, the Cardens assert that they did not act in bad faith and that the trial court erred both when it granted summary judgment and when it subsequently authorized the termination of water service to their residence. We agree and reverse both orders.

I

Lois and Donald Carter owned property in Freeland, on Whidbey Island. In 1986, the Carters decided to subdivide their property, through a short plat application, into two parcels, Lot A and Lot B. As part of the subdivision process, the Carters sought approval from Island County (the County) for a public water system consisting of a well on Lot A that would provide water to both Lot A and Lot B. That same year, the Carters executed and recorded an "Operation and Maintenance Agreement" (1986 Agreement) that stated that the Carters, as owners of both Lot A and Lot B, granted the owners of Lot B an easement, to run with the land, for the use and purpose of conveying water from the well on Lot A to Lot B. The 1986 Agreement also stated that the owners of Lots A and B each possessed an undivided one-half interest in and to the use of the well and water system on Lot A. Although it is unclear from Island County records whether the approval process to list the well on Lot A as a public water system was ever completed, the County did list the well as a two party public water system.

Subsequently, the Carters built a home on Lot B, which was supplied with

2

water from the well on Lot A.[1] However, in 2008, the County informed the Carters that the well did not meet the water quality requirements of a public water system. Because the well only served the single residence on Lot B, the Carters asked the County to deactivate the well's listing as a public water system. The County complied.

In 2013, following the Carters' deaths, Bryan and Tera Carden purchased Lot B and the Carters' former residence from the Estate. In the 2013 PSA, the Estate represented that Lot B is connected to a well and the parties agreed that a "Shared Well agreement [was] to be recorded prior to closing."

In an attempt to comply with the terms of the 2013 PSA, the Estate recorded a shared well agreement in 2013 (2013 Shared Well Agreement), prior to closing the sale with the Cardens. However, the Estate did so without first submitting the 2013 Shared Well Agreement to the County to get approval for the well to be again listed as a public water system. It was not until July 2015 that the Estate submitted its 2013 Shared Well Agreement to the County for the purpose of listing the well on Lot A as a public water system. Upon receipt of the 2013 Shared Well Agreement, the County initially sent the Estate a letter approving the listing of the well on Lot A as a public water system. However, only a month later, the County revoked this approval and informed the Estate that approval was conditional on the payment of an outstanding application fee and on the correction of deficiencies in the 2013 Shared Well Agreement, chief among them being the failure of the agreement to address the previously existing

---

[1] Lot A was, at all times pertinent to this appeal, a vacant lot.

1986 short plat and the accompanying 1986 Agreement. To date, these conditions have not been met and the well remains not listed as a public water system.

Meanwhile, the Cardens, concerned that the Estate was not properly managing the well, hired an attorney, Robert Brewster, to assist in enforcing their water rights. Brewster noticed several deficiencies with the recorded 2013 Shared Well Agreement.[2] After discussing these issues with representatives of the Estate, it was agreed that Brewster would draft a new shared well agreement to supersede both the 1986 short plat and accompanying 1986 Agreement, and the 2013 Shared Well Agreement. Brewster then drafted this agreement (2015 Shared Well Agreement). However, it was never signed by the Estate or the Cardens and was never recorded.

While the Estate was in negotiation with the Cardens regarding a new shared well agreement, it was also attempting to sell Lot A. The Estate attracted a buyer, Heidi Norris, who initially agreed to purchase the property and was permitted to move on to the property (in an RV) prior to closing the sale. Norris was informed of the well agreement issues involving her would-be neighbors, the Cardens, and she informed the Estate that she could not accept the 2015 Shared Well Agreement drafted by Brewster. Based on Norris's feedback, the Estate proposed two modifications to the 2015 Shared Well Agreement. Specifically, the Estate wanted to add (1) a clause requiring the Cardens to give 24 hours'

---

[2] Brewster notified the County following its initial approval of the 2013 Shared Well Agreement that the 2013 Shared Well Agreement did not address the 1986 short plat and muddled the ownership rights in the well and well water of the owners of Lots A and B.

notice to the owner of Lot A before entering onto Lot A to access the well (with an exception in case of emergencies), and (2) a clause providing that the shared well agreement would be void if the parties did not sign it within 30 days of each other. The Cardens did not agree to these additional terms, negotiations stalled, and Norris ultimately decided not to purchase the property.

Subsequently, the Estate sued the Cardens, alleging that it failed to sell Lot A to Norris because of tortious interference by the Cardens. The Estate alleged that the Cardens went on to Lot A and harassed Norris after she moved onto Lot A. The Estate alleged that Norris backed out of purchasing Lot A because of the Cardens' interference. The Cardens answered by denying the Estate's allegations and raising counterclaims, including a claim for breach of contract for the failure to provide "a valid and legally approved agreement for the operation of the well and water system" on Lot A as required by the 2013 PSA.

Then, in 2017, the Estate sent the Cardens an updated version of the 2015 Shared Well Agreement that included the Estate's two previously proposed additional terms regarding notice and signing requirements (2017 Shared Well Agreement). When the Cardens declined to sign the 2017 Shared Well Agreement, the Estate moved for partial summary judgment seeking dismissal of the Cardens' counterclaim for breach of contract. The Estate argued that the Cardens' failure to sign the 2017 Shared Well Agreement violated their contractual duty of good faith and fair dealing under the 2013 PSA and that this excused the Estate from its contractual obligation to provide an acceptable shared well agreement.

5

The trial court agreed with the Estate and granted partial summary judgment, concluding that the Cardens acted in bad faith when they declined to sign the 2017 Shared Well Agreement. The trial court reasoned that it was (1) reasonable to require 24 hours' notice, excepting cases of emergency, before the Cardens could enter on to Lot A, and (2) reasonable to require the parties to sign the agreement within 30 days of each other because of the Cardens' alleged harassment of Norris. The trial court ordered that the "Estate's performance of its contractual obligation to provide [the Cardens] a Shared Well Agreement is excused because [the Cardens] obstructed its performance."

Then, fearing that the Estate would terminate their access to the well, the Cardens filed a motion seeking to enjoin the Estate from shutting off the Cardens' water. The Cardens asserted that (1) as the owners of Lot B, they had an easement to access and use the well on Lot A as the result of the 1986 short plat and the 1986 Agreement, and (2) the Cardens had relied on the Estate's representation—when purchasing Lot B—that the Lot B residence was connected to and served by the Lot A well and the Estate should be equitably estopped from terminating this connection. The trial court disagreed, concluding that there was no easement and that the Cardens' breach of their duty of good faith—by failing to sign the 2017 Shared Well Agreement—gave the Cardens unclean hands and prevented them from obtaining equitable relief. The trial court ordered that the Estate "may terminate water service to [the Cardens]' residence on Lot B from the Well on Lot A."

The Cardens then sought reconsideration of the trial court's denial of their motion, which was also denied. They also filed a petition for discretionary review, seeking review of the trial court's denial of their motion as well as review of the order granting partial summary judgment in favor of the Estate. The Cardens also sought an emergency stay of the trial court's order authorizing the Estate to terminate their water service pending review. A commissioner of this court granted the stay and granted review of both the trial court's order granting partial summary judgment and the trial court's order authorizing the termination of the Cardens' water service. A panel subsequently denied the Estate's motion to modify the Commissioner's ruling.

II

The Cardens primarily contend that the trial court erred when it granted partial summary judgment, dismissing the Cardens' counterclaim for breach of contract and ruling that the Cardens breached their duty of good faith by failing to sign the 2017 Shared Well Agreement. This is so, the Cardens assert, because they had no duty, under the 2013 PSA, to sign the 2017 Shared Well Agreement. The Cardens further assert that because the trial court's subsequent order authorizing the Estate to terminate the Cardens' access to the water from the well on Lot A was premised on this erroneous summary judgment order, it too must be reversed. We agree that both the summary judgment order and the subsequent order authorizing the Estate to terminate the Cardens' access to water from the well on Lot A were entered in error.

A

We review de novo a trial court's grant of summary judgment. Greensun Grp., LLC v. City of Bellevue, 7 Wn. App. 2d 754, 767, 436 P.3d 397, review denied, 193 Wn.2d 1023 (2019). Summary judgment is proper only "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 18, 352 P.3d 807 (2015). On review, we "conduct the same inquiry as the trial court and view all facts and their reasonable inferences in the light most favorable to the nonmoving party." Greensun Grp., LLC, 7 Wn. App. 2d at 767 (citing Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 350, 144 P.3d 276 (2006)).

B

The purpose of contract interpretation is to determine the intent of the parties to the contract. Roats v. Blakely Island Maint. Comm'n, Inc., 169 Wn. App. 263, 273-74, 279 P.3d 943 (2012). In Washington, courts "follow the objective manifestation theory of contracts." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). When interpreting an agreement, we consider its objective manifestations to determine the intent of the parties. Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016). When considering the language of a written agreement, we "impute an intention corresponding to the reasonable meaning of the words used" in the writing. Hearst Commc'ns, Inc., 154 Wn.2d at 503 (citing Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, 123 Wn.2d 678, 684, 871 P.2d 146 (1994)).

We may also "consider extrinsic evidence to assist in ascertaining the intent of the parties in entering into a contract, regardless of whether the language used in the writings is deemed ambiguous." Pitell v. King County Pub. Hosp. Dist. No. 2, 4 Wn. App. 2d 764, 774, 423 P.3d 900 (2018) (citing Hearst Commc'ns, Inc., 154 Wn.2d at 502). The intent of the parties in reducing an agreement to writing may also be discovered from "'the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" Tanner Elec. Co-op v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996) (internal quotation marks omitted) (quoting Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc., 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993)). "However, such extrinsic evidence is admitted only 'for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument.'" W. Coast Pizza Co., Inc. v. United Nat'l Ins. Co., 166 Wn. App. 33, 38, 271 P.3d 894 (2011) (internal quotation marks omitted) (quoting Berg v. Hudesman, 115 Wn.2d 657, 669, 801 P.2d 222 (1990)).

"When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." RESTATEMENT (SECOND) OF CONTRACTS § 204 (AM. LAW INST. 1981). "[I]f the contract cannot be performed without resolution of the undetermined

9

point, but the parties have intended to contract, and a reasonable term can be inferred to have been intended, each party will be bound to agree to a reasonable determination of the unsettled point in order that the main promise may be enforced." 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:31, at 880-81 (4th ed. 2007). In such a situation, "the court quite properly asks what the parties would have done if the issue had been raised when the contract was being negotiated." 6 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 26.2, at 401 (rev. ed. 2010).

Washington courts have long applied these principles to determine a party's implied obligations under a contract. See, e.g., Byrne v. Bellingham Consol. Sch. Dist. No. 301, 7 Wn.2d 20, 28-29, 108 P.2d 791 (1941) (concluding that the school board was, "under the clear implications of the contract," required to keep its school building in a fit state to enable a contractor to complete his work therein within the time required by the contract). Indeed, Washington courts will even imply material terms, such as a price term, when such terms can be clearly inferred. See, e.g., Pitell, 4 Wn. App. 2d at 772-73 (concluding that contract language requiring Pitell to pay "the balance due" and informing him that he is "responsible for payment of [his] account" showed "the parties' mutual understanding that the amount owed by Pitell was definite or capable of being made so" by reference to the hospital's chargemaster (alteration in original)).

"There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Badgett v. Sec. State Bank, 116 Wn.2d

563, 569, 807 P.2d 356 (1991). This duty, however, does not obligate a party to accept any material changes to the terms of its contract. Betchard-Clayton, Inc. v. King, 41 Wn. App. 887, 890, 707 P.2d 1361 (1985). Furthermore, the duty is not free-floating, but "arises only in connection with terms agreed to by the parties." Badgett, 116 Wn.2d at 569.

C

The Cardens contend that the trial court's ruling that they acted in bad faith was erroneous. This is so, they assert, because both parties had already completed performance under the 2013 PSA when the 2013 Shared Well Agreement was recorded, and thus there was no duty of good faith to negotiate a new shared well agreement. In response, the Estate asserts that it had yet to perform its obligations under the 2013 PSA, that the 2017 Shared Well Agreement was an attempt to perform its obligations, and that the Cardens were obligated to accept the 2017 Shared Well Agreement. In the alternative, the Estate also asserts that it satisfied its obligations under the 2013 PSA when the County approved the well as a public water system in 2015 based on the 2013 Shared Well Agreement, and that the Cardens acted in bad faith by inducing the County to revoke approval.[3] Neither party provides an entirely correct analysis, but we conclude that the Cardens were not obligated to sign the 2017 Shared Well Agreement as presented.

---

[3] Citing to the rules of appellate procedure governing issue preservation in appeals, rather than to the rules governing discretionary review, the Estate also contends that the Cardens did not properly preserve their objections to the trial court's partial summary judgment order. In addition to the fact that this is a discretionary review of an interlocutory order, and not an appeal of a final judgment, the Estate's preservation argument has already been rejected by both our court commissioner, when she granted review, and by the court, when the panel denied the Estate's motion to modify the commissioner's ruling. This contention merits no further discussion.

The 2013 PSA required that a shared well agreement be recorded prior to the close of sale. The Cardens assert that the recording of the 2013 Shared Well Agreement satisfied this contractual obligation, despite the fact that the 2013 Shared Well Agreement was not approved by the County in order for the well to become an authorized public water system and that the Cardens themselves asserted in their answer to the Estate's complaint that the 2013 Shared Well Agreement was not legally valid. The Cardens' contention is unavailing. It is plainly not reasonable to conclude that the parties to the real estate transaction intended merely to record a document labeled "shared well agreement" that did not have the actual effect of sufficing as a legally valid shared well agreement so as to have the well approved by the County as a public water system. Thus, the recording of the 2013 Shared Well Agreement was, at most, an unsuccessful attempt, by the Estate, to perform its obligations under the 2013 PSA.

Similarly incorrect are the Estate's protestations that it satisfied its obligations under the 2013 PSA when the County, relying on the 2013 Shared Well Agreement, briefly listed the well on Lot A as a public water system in 2015. This is so because the 2013 Shared Well Agreement stated that the owner of Lot A retained a 100 percent ownership interest in the well on Lot A, contradicting the 1986 Agreement and the 1986 short plat, which purported to give a one half undivided ownership interest in the well to the owner of Lot B.[4] The 2013 PSA

---

[4] Because the short plat is not in the record before us on appeal, we are unable to conclusively determine if the ownership interest purportedly granted to the owner of Lot B is actually set forth therein. However, because we are reviewing an order granting summary judgment, and the 1986 Agreement supports an inference that the 1986 short plat does contain such a grant, we conclude that genuine issues of material fact exist as to whether the 1986 short plat granted an ownership interest in the well on Lot A to the owner of Lot B and as to the extent of that ownership interest.

did not purport to reserve to the owners of Lot A any portion of the owner of Lot B's ownership interests, interests which were last defined by the 1986 Agreement and the 1986 short plat. Thus, the 2013 Shared Well Agreement plainly does not reflect the agreement of the parties, as set forth in the 2013 PSA, that the Cardens would purchase Lot B (as opposed to only *some* of the rights of ownership of Lot B), and therefore, could not possibly satisfy the Estate's obligations under the 2013 PSA.

Therefore, because the Estate has not yet completed performance of its obligation to provide a shared well agreement, the Cardens have a duty of good faith to cooperate with the Estate in its efforts to complete its obligation.[5]

It is not so, however, that merely because the Cardens have a duty to not interfere with the Estate's performance of its obligation, they necessarily were obligated to sign the 2017 Shared Well Agreement as presented. The Cardens assert that they refused to sign the 2017 Shared Well Agreement because of their disagreement with two clauses: one requiring that, excepting emergencies, the Cardens give 24 hours' notice before entering Lot A, and one that required the second signatory to the agreement to sign no later than 30 days after the first party signed the agreement. The Cardens correctly contend that if either of these requirements were not part of the parties' original agreement, embodied in the 2013 PSA, then they are not obligated to sign the 2017 Shared Well

---

[5] Although the 2013 PSA required the recording of a shared well agreement to be completed prior to closing, the parties do not contend that the timing was a material term of the agreement. Furthermore, it is clear that the parties did not consider the timing of the paperwork to be a material term of the contract at the time of closing given that they closed the sale of Lot B despite the failure to timely complete a shared well agreement and receive County approval for a public water system.

Agreement. See Badgett, 116 Wn.2d at 569 (explaining that the duty of good faith does not obligate acceptance of material changes to the terms of an agreement).

The 2013 PSA does not set forth any explicit notice requirement nor does it explicitly require that the parties sign any shared well agreement within 30 days of each other. As the parties' intent regarding these terms is critical to the resolution of the issues presented herein, we must determine whether these terms may be reasonably implied to have been part of their agreement. See RESTATEMENT § 204. In so doing, our task is to determine "what the parties would have done if the issue had been raised when the contract was being negotiated." 6 PERILLO, supra, at 401. In short, we seek to determine whether the parties would have agreed to a 24-hour notice requirement, excepting emergencies, and a 30-day signing requirement, had such requirements been raised in 2013. Standards of reasonableness control the inquiry, as does the parties' knowledge of facts at the time of closing.

One of the most common implied conditions in a contract is reasonable notice. 15 RICHARD A. LORD, WILLISTON ON CONTRACTS § 48:7, at 591 (4th ed. 2007). This is because, frequently, "the parties will fail to include an express provision governing whether and when notice is to be required in their agreement." 15 LORD, supra, at 591-92. An implied condition of reasonable notice is an implied in fact condition. 15 LORD, supra, at 593. "Implied in fact conditions are similar in their nature to express conditions, except that the parties

have expressed their intentions not in words but in the nature of their undertakings." 15 LORD, supra, at 546 (footnote omitted).

Herein, the nature of the 2013 PSA was the sale of a home on Lot B, wherein the seller, as part of the sale, promised the buyers that the home would have access to potable water from the well on Lot A. It is plainly not in the nature of a sale of one lot, Lot B, to authorize unlimited access without notice to enter the private land of another, Lot A. Similarly, it is also plain that some access to the well on Lot A would be in the nature of such a sale, to ensure the continuous supply of potable water to Lot B. Under these circumstances, and given the silence of the explicit terms of the 2013 PSA, concluding that a 24 hours' notice requirement, excepting cases of emergency, was an implied term is eminently reasonable.

In contrast, the record strongly supports an inference that the 30-day signing requirement was never part of the parties' 2013 PSA. Indeed, the Estate does not contend that the 30-day signing requirement was a part of its original agreement with the Cardens. Instead, the Estate represented to the trial court, and on discretionary review continues to assert, that it sought the 30-day signing requirement because of the Cardens' alleged misbehavior *subsequent* to the execution of the 2013 PSA. The Estate asserts that the 30-day signing requirement was reasonable in light of the Cardens' alleged harassment of Norris and the Estate's fear that the Cardens would pocket any shared well agreement in an effort to force the Estate to sell Lot A to the Cardens. The trial court agreed, explicitly referring to the Cardens' alleged harassment of Norris and

15

finding that the 30-day signing requirement was reasonable "because of this type of behavior."

The trial court thus considered allegations of misbehavior by the Cardens committed *after* the execution of the 2013 PSA to determine what may reasonably be implied as part of that agreement. This reliance on subsequent, and disputed, alleged behavior to determine whether the 30-day signing requirement could reasonably be imputed into the 2013 PSA was improper for two reasons. First, the trial court improperly treated as proved the disputed allegations of misbehavior brought by the Estate, the moving party, thereby flipping the summary judgment standard on its head.[6] Second, and more fundamentally problematic, the parties plainly did not premise the terms of their 2013 PSA on actions that had yet to occur and of which, necessarily, they had no knowledge. Thus, the 30-day signing requirement—which the Estate urges was added to address concerns about the Cardens' alleged misbehavior that occurred after the execution of the 2013 PSA—was plainly a new term not previously agreed to by the parties. The Cardens' good faith duty to assist in the Estate's performance of its obligations under the 2013 PSA did not require the Cardens to accede to this new term. Badgett, 116 Wn.2d at 569.

Because the 2017 Shared Well Agreement included a new term, the 30-day signing requirement, that was not part of the original 2013 PSA, the Cardens

---

[6] The Cardens treat this as grounds for requesting that we remand this case to a new judge. The Cardens assert, essentially, that by improperly relying on disputed factual allegations, the trial court judge showed that she could not fairly judge the case. Because the Cardens do not show how the judge's error indicates any inability to judge the case fairly, we reject this request. Being wrong is not the same thing as being biased. Were it otherwise, all reversed cases would require remand to a new judge.

did not violate their duty of good faith by refusing to sign it. Thus, the trial court erred when it granted partial summary judgment for the Estate, ruled that the Cardens breached their duty of good faith, and excused the Estate's performance of its obligation to provide a shared well agreement. Furthermore, because the trial court's subsequent order—authorizing the Estate to terminate the Cardens' access to water from the well on Lot A—was premised on its erroneous summary judgment order it, too, is erroneous. We therefore reverse both orders, and remand for further proceedings consistent with this opinion.[7]

Reversed and remanded.

WE CONCUR:

---

[7] The Cardens contend that they should receive an award of attorney fees below and on appeal "incurred defending the Estate's bad faith claim and efforts to shut off their water." The Cardens contend that their 2013 PSA authorizes attorney fees for the prevailing party in an action brought regarding any provision of the agreement. But this is a petition for discretionary review of interlocutory orders. There has been no final judgment and, therefore, there has been established no prevailing party.