IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CAROL TILLEY, | ) | |
| | ) | No. 39875-7-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| EDELWEISS MAINTENANCE | ) | |
| COMMISSION, a Washington non-profit | ) | |
| corporation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

FEARING, J. — Edelweiss Maintenance Commission, a homeowner association, severed homeowner Carol Tilley's water service after she disobeyed directions to limit her water use. The superior court dismissed without trial Tilley's causes of action for breach of contract and violation of the Consumer Protection Act. We affirm.

FACTS

This dispute concerns a homeowner association severing water services to a residential lot within the association. We relate some of the facts forwarded by the respondent association, but focus on the facts asserted by the appellant property owner and view the evidence in a light favorable to the property owner. Because the superior court dismissed the Consumer Protection Act (CPA) ch. 19.86 RCW, claim on a motion

to dismiss, we focus on the property owner's allegations on her complaint when reviewing the CPA cause of action.

In 1986, Carol Tilley acquired a plot of land at 31 Crabapple Road (the Crabapple Property) in Winthrop, within the Edelweiss community, a private development encompassing two hundred other properties. The Edelweiss Covenants, Conditions, and Restrictions (restrictive covenants), recorded in 1968, govern the development.

The restrictive covenants created the Edelweiss Maintenance Commission (EMC), a nonprofit corporation, as a homeowner association pursuant to the Washington homeowners association [Act], RCW 64.38. As a homeowner in Edelweiss, Carol Tilley became a member of EMC. The covenants authorize EMC to establish assessments "for the common benefit of such lots" including for utilities. Clerk's Papers (CP) at 555. As the homeowner association, EMC maintains the development's shared spaces and provides potable water to the lots.

Four paragraphs of the restrictive covenants declared:

> 6. Nuisances or Offensive Use: No nuisance or offensive use shall be conducted or suffered as to lots subject hereto. . . .
> 7. Utilities: *Grantor* shall provide . . . adequate water and electric power facilities to serve all such lots. For so long as a community water system is available, no private well or individual water source shall be created or used for lots subject hereto, and service to such community water system shall be connected, at each lot owner's expense. . . .
> 8. . . . .[T]he right of assessment and lien in favor of the *Maintenance Commission* as above provided may not be restricted or eliminated except as approved by resolution regularly adopted by the Board of Trustees of the *Maintenance Commission*, and …
> 9. Enforcement: In the event of violation of the terms hereof, *the Maintenance Commission* or the owner of any lot subject hereto, may

2

> institute proceedings for abatement or injunction or for damages and reasonable costs of any such action in any court having jurisdiction of the property subject hereto, the *Maintenance Commission* and each lot owner being recognized to have a proper interest in the matters herein provided for, and the matters provided for herein being recognized as specifically enforceable.

CP at 557-58 (emphasis added). When providing water, EMC operates independently of the Washington Utilities and Transportation Commission.

EMC adopted and periodically amended bylaws for the operation of the homeowner association. The latest version of the bylaws, adopted in 2018, confirmed Carol Tilley's membership in EMC. As a homeowner and member, Tilley is entitled to one vote in membership business. The membership votes for a board of directors, which oversees EMC's affairs, and officers, who manage affairs.

The bylaws grant EMC "powers necessary and proper for the governance and operation of the association." CP at 567. The EMC bylaws also reads in part:

> Section 1.9  Association Powers. Unless otherwise provided in the governing documents, the Association may:
> . . . .
> (3) Hire and discharge or contract with managing agents and other employees, agents, and independent contractors;
> . . . .
> (6) Regulate the use, maintenance, repair, replacement, and modification of common areas;
> (7) Cause additional improvements to be made as a part of the common areas;
> . . . .
> (10) Impose and collect any payments, fees, or charges for the use, rental, or operation of the common areas;
> . . . .
> (13) Exercise all other powers that may be exercised in this state by the same type of corporation as the association; and

(14) Exercise any other powers necessary and proper for the governance and operation of the association.

CP at 566-67. The bylaws grant to the EMC Board of Directors:

The Board of Directors shall have the powers and duties provided for the administering authority of the Corporation in the Homeowners' Associations Act and Nonprofit Corporations Act and in the Articles and Covenant, and all other power necessary for the administration of the affairs of the Association, and may do all such acts and things as are not prohibited by statute or by the governing documents required to be done in another manner.

CP at 570.

Carol Tilley began receiving potable water from EMC on the construction of her home in 1998. Until 2019, Tilley adhered to the same terms for water usage as her neighbors within the development.

In the summer of 2019, EMC initiated a project to upgrade and replace old water pipelines near Carol Tilley's Crabapple Property. The project involved heavy machinery, including excavators, which raised dust near Tilley's home. Tilley ran a sprinkler on her driveway to suppress the road dust, inadvertently causing water to accumulate and flow onto the street.

On July 23, 2019, Gregg Strome, EMC's administration manager, emailed Carol Tilley to express concern about the water runoff and instructed her to limit her use. Strome wrote:

This email is sent with the understanding that your water is running in order to keep dust down in front of your house. I completely understand and will probably not say much on hot and dusty days[.]

4

> Currently the water is being run to excess. It's creating a mud problem, erosion and is now starting to affect your neighbors' property. FYI, the Methow river is running about 25 [percent] of average. There is a county wide drought that is recognized statewide. Along with that our water right does not cover watering our roadways. Please be aware and run irrigation water only when necessary for your yard or garden.

CP at 119. Tilley took no steps to reduce her water use in response to the July 23 message.

On August 23, 2019, Gregg Strome informed the Edelweiss community at large about a critically low level in the water reservoir and directed residents to minimize outdoor water use until repair of a pump. Strome wrote to all homeowners:

> We are having issues filling the reservoir that services the homeowners that live on Trillum, Crabapple, Heather, and Highland up from Crabapple.
> We aren't able to get repair people out until hopefully Monday. The *board and management* respectively request that if you live in the affected area, that you please curtail exterior water at least until we can get this problem with pumping resolved. In order to assure that everyone has adequate water for sanitary purposes, [m]anagement may use adjustments on water supply at your meters to regulate excessive water usage.
> If folks on that part of the system comply with this request, we should all have enough water to get us through the weekend and until repairs are completed.
> This is a community effort!
> Thanks for your understanding and compliance.

CP at 88-89 (emphasis added).

Carol Tilley once again ignored Gregg Strome's request to reduce watering the road. Mistakenly thinking she was the sole target of his directive, Tilley replied to Strome's message the same day:

5

> Thanks for the info Gregg. However[,] it is odd that you only sent ME these emaIls [sic].
>
> I'll forward this to the Okanogan Sheriff's office and my attorney so we are all on the same page. At some point this will move from a civil matter to a criminal matter. Keeping everyone abreast of the latest Edelweiss managerial actions regarding watering will make it clear that things have evolved from a construction precipitated water shortage to a punitive one aimed at illegal selective enforcement.

CP at 95.

On August 24, 2019, EMC disconnected Carol Tilley's water supply. Administration Manager Greg Strome explained in an email to Tilley that the discontinuation was a temporary measure, necessary to replenish the reservoir and ensure a steady water supply for the entire neighborhood. Thereafter Tilley parked a vehicle over the water meter vault linked to the Crabapple Property to block EMC's access to the meter.

On August 29, Gregg Strome wrote an email to Carol Tilley:

> Edelweiss Maintenance Commission would like to get the water service to your property restored as soon as possible.
> The conditions that EMC have [sic] are
> 1. Your pickup needs to be moved out of the Edelweiss right of way and off the meter vault and shall not be parked over the vault in the future.
> 2. You will not water the roadways without the express written approval of the Edelweiss Maintenance Commission.
> 3. [You] agree to cooperate with necessary occasional watering restrictions such as our present situation of needing to repair the booster pump. All users in this pressure zone have been advised to not irrigate externally until the pump has been repaired and notification of homeowners by EMC that exterior watering is allowed.

CP at 93. Tilley ignored Strome's August 29 message.

6

On September 3, 2019, EMC manager Gregg Strome again requested by email that Carol Tilley remove her vehicle from EMC's right of way. Strome wrote:

> The grader/ excavator work is starting today. We need to have your vehicles moved off of the road and right of way in order to do the work on Crabapple and Highland Rd.

CP at 102. Tilley ignored this second plea.

On September 16, 2019, EMC Administration Manager Gregg Strome ventured to Carol Tilley's Crabapple Property. Strome photographed a car positioned over the water meter. Strome commented to Tilley that the car prevented EMC from restoring water service to her property. After Strome left the area, Tilley moved the car from blocking her water meter, restored the water supply to her Crabapple Property, and repositioned the car over the water meter once more in order to continue to obstruct EMC's access.

Edelweiss responded to Carol Tilley's continuing blockade by disconnecting, at the development's mainline, the water supply to the Crabapple Property. Forced to regroup, Tilley installed a cistern on her land.

On October 1, 2019, EMC Manager Gregg Strome informed Carol Tilley that Edelweiss had completed the repairs to the pump station. Strome encouraged Tilley to work with EMC to reconnect her water supply. The message read:

> There is no reason that we could not reconnect your water service if you would move your vehicle obstructing our access to your water meter. We would however require that you agree to the conditions of service previously presented to you by Gregg Strome our administrative manager. These conditions are that;
> 1. There will be no unauthorized watering of streets by you either directly or as indirect runoff due to excessive irrigation on your property.

7

2. You will comply with future water use restrictions considered necessary by EMC to maintain adequate water service in your service area.
3. You will not use or tamper with other water services in your neighborhood unless with the advance approval of the property owner.
4. You will not block access to the water meter serving your property by EMC staff.

CP at 143. EMC also demanded that Carol Tilley remove her cistern unless it was equipped with the proper backflow prevention devices. Tilley replied to Edelweiss' demands with a cryptic "HaHaHaHaHaHa!" CP at 143.

Following the October 1 email exchange, the dispute entered hibernation as Carol Tilley traveled for the winter. Upon Tilley's return to the Crabapple property in May 2020, EMC's president sent her an email reiterating the requirements listed by Gregg Strome in his October 1 missive.

In 2023, EMC circulated a statement of fees that reads in part:

Ongoing Costs

Annual Dues (2023)

$510.51 Residential Lots

$280.78 Campground Lots

Water Fees

$417.33/yr for all homeowners, full or part time, billed annually in January. Allocation of water is 84,000 gallons per household per year. Currently water is not metered.

Hose Bib fee (minimum fee) $107.32/yr. billed annually in January.

CP at 579.

PROCEDURE

On August 10, 2020, Carol Tilley filed suit against EMC for severing her water supply. Tilley alleged a breach of contract and violations of the CPA. In addition to damages, she sought an injunction to reinstate her property's water service. Because the superior court dismissed the CPA claim on a CR 12(b)(6) motion, we quote some of the paragraphs of the complaint:

> 2.1 . . . Tilley . . . currently occupies the Crabapple Property as her primary residence.
> 2.2 The Crabapple Property is a platted lot subject to the plan and covenants of EMC, a homeowner's association that maintains road and water services for Edelweiss lot owners.
> 2.3 EMC provides exclusive water service to lot owners, charging a single annual fee for usage of up to 84,000 gallons per household. . . .
> . . . .
> 2.5 On August 24, 2019, following a dispute over Tilley's use of water to suppress road dust, EMC abruptly, and without prior notice, disconnected the Crabapple Property from all access to water services. At the time of disconnection, Tilley was up to date on related water service fees. EMC has refused to restore water service to the Crabapple Property, even though it has continued to invoice Tilley for water service and Tilley has paid her water bill.
> 2.6 On or about June 9, 2020 Tilley requested detailed maps and water monitoring data from EMC for the purpose of evaluating EMC's allegation that Tilley had used excessive amounts of water. EMC has refused to provide these records despite their contractual and legal obligations pursuant to Article 8 of the EMC by-laws and RCW 64.38.045(2).
> 2.7 Tilley has sustained damages as a result of EMC's disconnection of water from her property.
> . . . .
> 3.2 EMC's disconnection of water services to the Crabapple Property was an unfair or deceptive act or practice occurring in trade or commerce.

9

        3.3  EMC's disconnection of water services to the Crabapple Property had a public interest impact because it had the capacity to injure others.

        3.4  Tilley has sustained injuries to her property as a result of the EMC's disconnection of water services to the Crabapple Property.

        3.5  EMC's disconnection of water services to the Crabapple Property caused the injury to Tilley.

        3.6  EMC's actions as alleged herein violated RCW 19.86.020.  As a result of the EMC's violations of the Consumer Protection Act, Tilley has sustained damages in an amount to be proven at the time of trial.

CP at 6-7.

EMC brought a motion, under CR 12(b)(6), to dismiss Carol Tilley's CPA claim on the basis that the allegations in the complaint failed to state a cause of action.  The trial court granted the motion.  Thereafter, EMC filed a summary judgment motion to dismiss the contract claim.  Carol Tilley filed a cross-motion for partial summary judgment on her contract cause of action.  The superior court granted EMC's motion and denied Tilley's motion.  The court also granted EMC an award of reasonable attorney fees and costs against Tilley.

## LAW AND ANALYSIS

Carol Tilley appeals dismissal of her CPA claim, the summary judgment dismissal of her contract cause of action, and the award of reasonable attorney fees and costs to EMC.  She also assigns error to the superior court's refusal to grant her summary judgment motion on her contract claim.

10

In its brief to this court, EMC asserts facts with citations to records stricken by the trial court. We do not consider those facts because EMC did not cross-appeal the trial court's grant of Carol Tilley's motion to strike.

Consumer Protection Act

The superior court dismissed Carol Tilley's CPA cause of action for failing to state a claim in her complaint. A defending party bears a higher burden to prevail on a motion to dismiss than winning a summary judgment motion. After reviewing Carol Tilley's complaint and despite EMC facing this high burden, we affirm the dismissal of the CPA claim.

The law disfavors dismissals under CR 12(b)(6). *West v. Washington Association of County Officials*, 162 Wn. App. 120, 128, 252 P.3d 406 (2011). Dismissal is warranted only if the trial court concludes, beyond a reasonable doubt, that the plaintiff cannot prove any set of facts justifying recovery. *West v. Washington Association of County Officials*, 162 Wn. App. 120, 128 (2011). Any hypothetical situation conceivably raised by the complaint defeats a CR 12(b)(6) motion if it is legally sufficient to support plaintiff's claim. *Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978). Conversely, we may not speculate on the existence of facts that do not appear in the record. *Gnecchi v. State*, 58 Wn.2d 467, 471, 364 P.2d 225 (1961). Hypothetical or otherwise, the complaining party must supply the facts to support her claim. Also, while we accept the claimant's factual allegations as true, we do not necessarily accept her legal conclusions. *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107,

11

120, 744 P.2d 1032, *amended by* 750 P.2d 254 (1987). Determining the applicability of a statute to a given set of facts is a legal judgment. *Leingang v. Pierce County Medical Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

We restate the critical facts alleged in Carol Tilley's complaint. EMC is a homeowner association formed to maintain common property and enforce covenants in Edelweiss, an Okanagon County residential development. EMC, the exclusive supplier of water in the homeowner association, disconnected, without notice, Tilley's water service to her residence despite her being current on her fees after a dispute with Tilley over her use of water to suppress road dust. EMC asserted that Tilley used excessive water, but the association refused to restore water service to Tilley's residence despite continuing to invoice her and her payment of the invoices. According to Tilley, EMC's disconnection of water services to her property impacted a public interest because the conduct had the capacity to injure others.

The two principal sections of the CPA lie in RCW 19.86.020 and 19.86.090. The former statute proscribes: "unfair or deceptive acts or practices in the conduct of any trade or commerce." The latter statute grants "[a]ny person who is injured in his or her business or property by a unfair or deceptive act or practice" a suit for damages.

Washington courts have ploddingly added structure and resolution to the expansive and amorphous language of the CPA. Our case law has developed a framework on how to analyze CPA claims. The Supreme Court has adopted five elements that the plaintiff must satisfy in order to prevail under a private CPA action: (1)

12

an unfair or deceptive act or practice (2) in trade or commerce, (3) which affects the public interest, (4) an injury to plaintiff's business or property, and (5) a causal link between the unfair or deceptive act or practice and the injury. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). EMC argues that Carol Tilley failed to plead facts sufficient to fulfill elements one and three of the five-part test. We agree that Tilley fails to satisfy element three, the public interest component. Therefore, we do not address whether Tilley fulfills element one, the unfair or deceptive act constituent.

Prior to 1970, the CPA did not allow private suits for damages for violations of RCW 19.86.020. In 1970, the legislature recognized the need for an additional enforcement mechanism and amended RCW 19.86.090 to provide for a private right of action to recover damages for and enjoin violations of RCW 19.86.020. LAWS OF 1970, 1st Ex. Sess., ch. 26, § 2. The amendment encourages individual citizens to bring suit to enforce the CPA. *Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 836, 161 P.3d 1016 (2007). Still because of the nature of the CPA, the claimant must show the challenged acts or practices affect the public interest. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 790 (1986). The private right of action seeks to redress injury to the public. *Hockley v. Hargitt*, 82 Wn.2d 337, 349-50, 510 P.2d 1123 (1973).

In a private action, a plaintiff can establish that the lawsuit would serve the public interest by showing a likelihood that other plaintiffs have been or will be injured in the same fashion. *Trujillo v. Northwest Trustee Services, Inc.*, 183 Wn.2d 820, 835, 355 P.3d

1100 (2015). Early on, the Supreme Court wrote that other persons must be injured in "exactly" the same fashion. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 790 (1986). Generally, private disputes lack a public interest. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744, 935 P.2d 628 (1997). Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest. *Behnke v. Ahrens*, 172 Wn. App. 281, 293, 294 P.3d 729 (2012).

The court considers four factors to assess the public interest element when a complaint involves a private dispute: (1) whether the defendant committed the alleged acts in the course of its business, (2) whether the defendant advertised to the public in general, (3) whether the defendant actively solicited this particular plaintiff, and (4) whether the plaintiff and defendant have unequal bargaining positions. *Michael v. Mosquera–Lacy,* 165 Wn.2d 595, 605, 200 P.3d 695 (2009). In another decision, the Supreme Court restated the factors and added a fifth:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 790 (1986). The plaintiff need not establish all of these factors, and none is dispositive.

*Trujillo v. Northwest Trustee Services, Inc.*, 183 Wn.2d 820, 836 (2015). The law fails to

14

instruct whether the court reviews the four or five factors if the plaintiff cannot show that other persons have been or will be injured in the same manner.

We review, in chronological order, a series of Washington decisions that aid in adjudging whether a private dispute impacts the public interest for purposes of the CPA. In *Banks v. Nordstrom, Inc.*, 57 Wn. App. 251, 264, 787 P.2d 953 (1990), Nordstrom accused Lisa Banks of shoplifting. A security officer had caught Lisa's sister shoplifting, and the sister carried Lisa's identification on her. Nordstrom rebuffed Lisa's attempt to correct the record. Lisa sued Nordstrom under numerous theories, including a claim under the CPA. The court summarily dismissed the claim because Nordstrom had not engaged in such conduct before and the retailer's actions did not form a general course of conduct.

In *Eifler v. Shurgard Capital Management Corp.*, 71 Wn. App. 684, 688, 696, 861 P.2d 1071 (1993), this court found that sufficient evidence supported a ruling that a storage facility had violated the CPA. The facility placed a Yellow Pages advertisement that read: "'We Have Safe Storage All Locked Up.'" The ad further proclaimed: "'fenced and lighted,'" with a "'resident manager'" and "'electronic security and gates.'" In a separate flier, the company stated, "'Shurgard managers live right on site,'" "'making sure everything is *safe* and *secure*.'" (Emphasis in original) These representations were false. Shurgard's conduct impacted the public because it disseminated to the entire public its company name, its yellow pages advertisement, and

its fliers. All were part of a generalized course of conduct, and all were capable of repetition with respect to numerous members of the public.

In *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 935 P.2d 628 (1997), the tire manufacturer sued a local dealer for amounts owed for the wholesale purchase of tires for resale. The dealer asserted counterclaims for, among other causes of action, violations of the CPA. The dealer complained that the manufacturer directly sold tires to customers in the dealer's geographic territory, allowed other dealers to expand into dealer's territory, and placed an employee of the dealer in another dealership where the employee solicited dealer's customers. The Court of Appeals affirmed the trial court's summary dismissal of the CPA cause of action. The dealer was an experienced businessman who had contracted with the manufacturer for years. The dealer was not vulnerable to exploitation.

In *Michael v. Mosquera-Lacy*, 165 Wn.2d 595 (2009), patient Patsy Michael alleged that her dentist used cow bone as part of a bone graft when she specifically informed the dentist she did not want the use of any animal product. The Supreme Court affirmed summary dismissal of the CPA claim because of the failure to satisfy the public interest element. The patient failed to identify any real and substantial potential for repetition of the conduct and the same injury to other patients. The dentist offered dental care to the general public, but did not advertise to the public and did not actively solicit Patsy Michael as a patient.

16

In *Behnke v. Ahrens*, 172 Wn. App. 281 (2012), a client contended that an attorney violated the CPA when recommending the client engage in a transaction, in which the attorney possessed a financial interest. This court affirmed a summary judgment dismissal of the claim because of the failure to show the attorney repeated his conduct.

In *Bavand v. OneWest Bank*, 196 Wn. App. 813, 385 P.3d 233 (2016), a borrower complained that the bank engaged in an unfair act when demanding that she sign two separate notes for the same debt. The court dismissed a CPA claim because the borrower failed to show that the facts underlying her "two notes" theory have been replicated.

Carol Tilley's complaint portrays a quarrel entailing unique facts between one individual resident and her homeowner association. EMC is not a sophisticated business that markets to the public in general but rather functions as a group of homeowners wishing to improve the neighborhood. EMC does not advertise to serve the general public with water delivery. EMC does not seek a profit.

We recognize that EMC holds a monopoly for water service in the Edelweiss community. Still Carol Tilley is not a vulnerable contracting party with EMC. She is part of the homeowner association and can vote for directors and officers. She could seek to be a director or officer. She can organize with other homeowners to control the affairs of EMC.

In paragraph 2.2 of her complaint, Carol Tilley alleges that EMC serves other lot owners in the development's homeowner association. In paragraph 3.3 of the complaint, Tilley alleges that EMC's disconnection of water services to her residence impacts the

17

public interest because the conduct had the capacity to injure others. According to Tilley, her neighbors along Crabapple Road are now in jeopardy of having their water service unilaterally severed without notice for similar attempts to control dust around their homes.

Although Carol Tilley suggests that EMC may discontinue the water of other property owners, she does not plead that the association will do so under the same circumstances as her plight. More importantly, as in *Banks v. Nordstrom, Inc.*, Tilley does not allege that EMC has engaged in such behavior before or that the conduct will likely reoccur. Tilley did not plead that EMC engaged in a general course of conduct. She did not identify in her complaint any real and substantial potential for repetition of the conduct and the same injury to others.

We agree with Carol Tilley that the cases discussed above involve the trial court granting a summary judgment motion, rather than a CR 12(b)(6) motion to dismiss. None of the decisions, however, rejected the possibility of granting a motion to dismiss under the case's circumstances. Also, determining the applicability of a statute to a given set of facts is a legal judgment. *Leingang v. Pierce County Medical Bureau, Inc.*, 131 Wn.2d 133, 150 (1997).

Contract

Carol Tilley asserts that EMC violated two contracts when terminating her water service. The first purported agreement outlined the 2023 fee schedule for water delivery to each homeowner for the allocated 84,000 gallons of water. The second agreement

18

arises from paragraph 7 of the restrictive covenants that reads in part that EMC shall provide adequate water facilities to serve all lots and demands that each lot owner connect to the development's water system. Tilley argues that, since connecting to the water system is obligatory and she met her obligations by paying for her water allocation, EMC lacked the prerogative to disconnect her service. Tilley notes that the covenants authorize EMC to institute legal proceedings to enforce the covenants, and then she suggests this remedy is exclusive such that EMC could not terminate water service without a court order.

EMC and Carol Tilley do not quarrel over the underlying facts. The parties also agree as to the documents that govern their relationship. The dispute requires this court to determine whether those documents allow EMC the right to terminate water service to a homeowner when the homeowner disobeys instructions and whether EMC must first obtain a court order before disconnecting service. We conclude that the governing documents together with homeowner association statutes granted EMC the right to terminate service without filing suit.

Courts review restrictive covenants as if contracts. *Twin W Owners' Ass'n v. Murphy*, 26 Wn. App. 2d 494, 510, 529 P.3d 410 (2023), *review denied*, 534 P.3d 807 2023). A contract claimant must establish a valid contract between the parties, breach, and resulting damage. *Lehrer v. Department of Social & Health Services*, 101 Wn. App. 509, 516, 5 P.3d 722 (2000).

Carol Tilley does not challenge the lawfulness of EMC's water use restrictions. The undisputed evidence established that Tilley violated restrictions imposed on, not only her, but other homeowners because of a water shortage. Tilley's use also flooded a street. Neither the Edelweiss restrictive covenants nor the EMC bylaws expressly grant EMC the right to terminate services, but the broad powers afforded EMC necessarily implied that right.

The first purported agreement outlined the 2023 fee schedule for water delivery to each homeowner for the allocated 84,000 gallons of water. Of course, Edelweiss disconnected water service in 2019, four years before the publishing of the fee schedule. For this reason alone, the schedule cannot form the basis for a contract claim in these circumstances. Carol Tilley presents no evidence that a similar fee schedule controlled water service in 2019. The 2023 fee schedule also fails to address the remedies of Edelweiss if Tilley did not follow directions of the homeowner association.

We move to the restrictive covenants and bylaws. Paragraph 6 of the restrictive covenants prohibit nuisances and offensive uses of property. The EMC bylaws grant EMC authority to "regulate the use, maintenance, repair, replacement, and modification of common areas." CP at 566. The bylaws grant EMC broad governance powers including all "powers that may be exercised in this state by the same type of corporation as the association" and "any other powers necessary and proper for the governance and operation of the association." CP at 567. The August 23 direction to homeowners in Crabapple came from the Board of Directors. The EMC Board of Directors holds "all"

20

"power necessary for the administration of the affairs of the Association, and may do all such acts and things as are not prohibited by statute or by the governing documents required to be done in another manner." CP at 570. No covenant, bylaw, or statute precludes EMC from terminating water service to a homeowner when the homeowner refuses to comply with rules applied to all homeowners and thereby creates a nuisance.

The bylaws confirm the existence of EMC as a homeowner association created pursuant to the Washington homeowners association, RCW 64.38. The HOA act grants broad powers to a homeowner association. The powers include regulating "the use, maintenance, repair, replacement, and modification of common areas." RCW 64.38.020(6). "'Common areas' means property owned, or otherwise maintained, repaired or administered by the association." RCW 64.38.010(4). Common areas embrace roads and a water system. *Bangerter v. Hat Island Community Association*, 199 Wn.2d 183, 190, 186, 504 P.3d 813 (2022), *aff'd in part, rev'd in part*, 199 Wn.2d 183, 504 P.3d 813 (2022). Under the act, a homeowner association may also exercise "any other powers necessary and proper for the governance and operation of the association." RCW 64.38.020(14).

To repeat, paragraph 7 of the restrictive covenants addresses utilities and reads in part that the "*Grantor shall* provide . . . adequate water . . . to serve all such lots." CP at 557 (emphasis added). Carol Tilley emphasizes the word "shall" and argues that the provision precluded discontinuation of her water. EMC highlights the word "grantor" and distinguishes between grantor and EMC. According to EMC, the grantor is

Edelweiss Company, the developer who built the infrastructure of Edelweiss, not the later homeowner association. When the covenants wished to refer to EMC, the covenants used the phrase.

EMC contends that the drafter of the restrictive covenants knew to distinguish between the developer and the homeowner association, because the covenants use both terms in separate contexts. So, when the covenants refer to "grantor," the reader must conclude the language applies only to Edelweiss Company. We agree. For example, the restrictive covenants also state: "The Maintenance Commission is empowered to establish assessments upon lots in platted land." CP at 555. Liens "may be foreclosed by the Maintenance Commission." CP at 556. The "Maintenance Commission may establish permissive rules for the maintenance of trained riding horses." CP at 557. The "Maintenance Commission . . . may institute proceedings for abatement or injunction or for damages." CP at 558. The restrictive covenants only directed the "Grantor" to provide roads and water service to the development.

Assuming the duty to provide water service extended to EMC, we read into this obligation a corresponding duty on the homeowner to pay for the service and abide by rules of the homeowner association. Every contract incorporates an implied duty of good faith and fair dealing. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 26 Wn. App. 2d 319, 345, 527 P.3d 134 (2023). The duty obligates parties to the contract to cooperate with each other so that each may obtain the full benefit of performance. *In re Estate of Carter v. Carden*, 11 Wn. App. 2d 573, 583, 455 P.3d 197 (2019).

22

Carol Tilley next contends that the governing documents limited EMC's remedy to a suit for an injunction. She emphasizes two passages. First, the restrictive covenants declared that: "In the event of violation of the terms hereof, the Maintenance Commission or the owner of any lot subject hereto, *may* institute proceedings for abatement or injunction or for damages…." CP at 558 (emphasis added). Second, the Bylaws provide that: "[T]he Association *may*: . . . (11) . . . levy reasonable fines in accordance with a previously established schedule adopted by the board of directors…." CP at 566 (emphasis added).

EMC underlines that the two passages, on which Carol Tilley rely, employ the permissive "may," not the mandatory "shall." Courts construe the word "may" as permissive. *Case v. Dundom*, 115 Wn. App. 199, 202, 58 P.3d 919 (2002). The restrictive covenants and the bylaws include many examples of the mandatory "shall." For example, each owner *shall* be a member of EMC. Thus, the drafters knew when they wished to make a provision mandatory or permissive.

Paragraph 6 of the restrictive covenants prohibit the creating of a nuisance. Carol Tilley does not argue against her having created a nuisance by the water running upon the road. She does not contend that a homeowner association may not take steps, short of filing suit, to end a nuisance harming the common areas of the association.

We end with a quote from a treatise on restrictive covenants:

> Aside from management of the common property, the chief function of a community association is ordinarily enforcement of the servitudes and the rules and regulations governing the community. If the power is not

23

granted by the declaration, it will be implied to meet the likely expectations of purchasers of property in the community. . . . Using legal proceedings to enforce compliance with common interest community obligations should ordinarily be the last resort because of their expense and hostile character. The association has implied powers to use less drastic means to encourage compliance and deter violations by community members.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 6.8, cmt. a (2000).

What are reasonable enforcement methods will depend on the circumstances of the particular community and, in the first instance, is best determined by the association.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 6.8, cmt. b.

Attorney Fees

The trial court awarded Edelweiss attorney fees under RCW 64.38.050, which authorizes such an award in any action raising a claim under the homeowners association act. Carol Tilley maintains the trial court lacked authority to award fees because she never raised a claim under the act.

Carol Tilley misreads her own pleadings. Tilley alleged, before the superior court and this court, that Edelweiss violated RCW 64.38 by unilaterally shutting off her water service. A party subjects herself to an award of fees when she invokes the chapter as a basis for her claim against the homeowner association. *Bangerter v. Hat Island Community Association*, 14 Wn. App. 2d 718, 746 (2020).

EMC also seeks an award of reasonable attorney fees and costs on appeal. We grant this request.

24

CONCLUSIONS

We affirm the superior court's dismissals of the CPA claim and the contract claim.

We award EMC reasonable attorney fees and costs on appeal.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Cooney, J.

_____
Pennell, J.